UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:06-CV-4-H

GARDNER DENVER DRUM LLC                                          PLAINTIFF

V.

PETER GOODIER, and                                                 DEFENDANTS
TUTHILL VACUUM & BLOWER
SYSTEMS, A DIVISION OF TUTHILL
CORPORATION

**MEMORANDUM OPINION**

This matter is before the Court on Plaintiff Gardner Denver Drum LLC's ("Gardner Denver") motion for preliminary injunctive relief. Gardner Denver seeks to enforce a covenant not to compete entered into by Defendant Peter Goodier ("Goodier") and Drum Industries, Inc. ("Drum") on October 19, 1993.[1] Goodier is currently employed by Defendant Tuthill Vacuum & Blower Systems ("Tuthill"). Defendants object to the enforcement of the covenant on multiple grounds.

The Court has held a hearing and has considered all the relevant evidence. Both sides have thoroughly briefed the issues. For the reasons explained, the Court will sustain Gardner Denver's motion for a preliminary injunction.

I.

Goodier began working for Drum in England in January 1987 as a management trainee.

---

[1] Gardner Denver acquired Drum's parent company in January 2004.

Prior to the acquisition of its parent company by Gardner Denver, Drum was engaged in the business of selling blowers and other products for tank trucks. In May 1988, Goodier transferred to Drum's Louisville, Kentucky office, where he served as an inside sales manager until 1989. At that time, he became the head of engineering of specialized systems. In 1990, Goodier became the engineering manager for all Drum products in Louisville. On or about October 13, 1993, Goodier elected to transfer back to England and took a position with Drum's office there. Five days after leaving, however, Goodier told Graham Killarney, then Executive Vice President of Drum, that he wanted to return to work in Louisville in the position of Chief Engineer. In a letter (the "Killarney Letter") dated October 18, 1993, Killarney offered Goodier the position of Chief Engineer, to be located in Louisville. As the letter is highly significant to the issues in this case, it states in full:

> Dear Peter,
>
> I would refer to our telephone conversation earlier today. I have to express my surprise that after only five days you feel that an extended future in the United Kingdom would be unacceptable and would be prepared to return to Drum Inc. in Louisville.
>
> I hope you can therefore understand my apprehension regarding bringing you back to Drum Inc. [ ].
>
> Appreciating the difficult personal circumstances surrounding your decision to leave Drum Inc., I must ensure that any decision you make regarding a return to this company is made from a long term standpoint and not just as a means to an end. You are aware that we have now made a formal offer of employment to a well-qualified candidate for the position of Chief Engineer. [ ].
>
> In view of our regard for you and your service with Drum Inc. we are prepared to retract the offer made to the above candidate in favor of bringing you back from the UK to fill the post. It would however be a disaster for Drum Inc. if you are not certain that you want to make a long term commitment to this company. Our future relies heavily on an aggressive and innovative engineering resource, this can only be achieved by having the head of engineering committed to our long

2

term goals. [ ].

The position of Chief Engineer is an important and sensitive position within our management structure, we expect to develop a number of products over the coming year that will be envied by our competitors. We therefore require that you sign the attached non compete agreement.

It is my sincere hope that you return to Drum Inc. bringing the technical competence and drive we need to meet our long term objectives in the engineering area. If you sign the attached agreement . . . we will contact our alternative candidate withdrawing our offer. I must however have a firm answer by 8:00am Tuesday Oct 19, 1993.

The attached covenant not to compete (the "Covenant") reads, in relevant part, as follows:

1. For a period of three years from the time that Goodier stops working for Drum for whatever reason, Goodier shall not work for, in any capacity as an employee or otherwise, any business that competes with Drum in any area of the United States of America in which Drum does business. [ ]

3. If any provision of this agreement is found to be declared to be unenforceable, it shall first be construed, by limitation or reduction, so as to be enforceable. If after such limitation or reduction, any provision remains unenforceable, such enforceability shall not in any way affect the validity or enforceability of any other provision.

4. This agreement shall be governed by Kentucky law.

Goodier signed the Covenant on October 19, 1993, and returned to Louisville shortly thereafter.[2] In this position, his salary increased from $40,000 to $55,000 per year. Prior to being named head of engineering, Goodier was responsible for integrated systems, hydraulic

---

[2] Defendants claim that Goodier did not actually receive the position of "Chief Engineer," and that he returned instead to the position he had previously held, "engineering manager." However, Plaintiff claims that the term "chief engineer" is merely a British term meaning "engineering manager," and that Goodier did in fact receive that position, regardless of what it was actually entitled. In fact, Goodier stated in his declaration that the position of "Chief Engineer" could only be held by a licensed engineer, and that he therefore retained the title of "Engineering Manager" while Bob Jacobsen received the position of "Chief Engineer." Gardner Denver claims that Jacobsen actually reported to Goodier, and that the significance of the title is therefore immaterial. The Court will address the legal significance of the job title in a later portion of this opinion.

3

systems, and development, and no one reported to him. Following his return to Louisville, Goodier became engineering manager, which included a host of responsibilities, and certain individuals reported directly to him. In 1998, Goodier was promoted to Vice President of Engineering, and in 2003 added the title of Vice President of Operations. As Vice President of Operations, Goodier was responsible for production, purchasing and engineering at Drum in Louisville and had a staff of approximately forty individuals. Also in 1998, Goodier signed a confidentiality agreement (the "Confidentiality Agreement") prohibiting him from disclosing or misappropriating Drum's confidential information "including, but not limited to, trade secrets, strategic planning information, sales policies, customer lists, prices, unit sales, sales data, processes, methods, quality control information, materials, suppliers, drawings, designs, and technical and engineering information."

Following the Gardner Denver's acquisition of Drum, Goodier's responsibilities changed. Gardner Denver laid off a number of employees, including most of the production workforce, and Goodier's staff was substantially reduced. It transferred all of the truck blower manufacturing equipment from the Louisville facility to other Gardner Denver facilities by May 2004. Goodier's engineering work was reduced to a single product (Drum's hydraulic cooler for truck applications), which Goodier claims could be completed in one work day per week. In July 2004, Goodier was demoted from Vice President of Operations to Engineering Manager (his previous position), and his company car was revoked.[3] Goodier believed he would soon be terminated and accordingly sought alternative employment. He resigned from Gardner Denver in August 2004 and advised its management that he was joining Tuthill, a direct competitor.

---

[3] His salary appears to have remained the same.

Goodier states that when he advised Don Bierens, a Gardner Denver executive, that he was leaving, Bierens responded "I don't blame you." Gardner Denver did not voice any concern at the time about Goodier joining Tuthill. Goodier informed Tuthill that he had signed the Confidentiality Agreement, and Tuthill told him that he should be very careful not to use any confidential information in his employment at Tuthill. Goodier claims that his position at Tuthill was sufficiently different from those he held at Drum that none of the information he learned at Drum would be especially relevant to his employment at Tuthill.

As noted above, prior to its acquisition by Gardner Denver, Drum sold tank truck blowers. In order to develop this market, Drum engaged in manufacturing agreements with various companies. One such company was Tuthill, with which Drum entered a five year manufacturing agreement ("the Manufacturing Agreement") on March 5, 1990. Under the terms of the Manufacturing Agreement, Tuthill was prohibited from marketing any "Drum" or "Drum-style" blowers for a period of five years after the Manufacturing Agreement's termination. The Manufacturing Agreement was renewed for additional five year periods in 1995 and 2000. Tuthill terminated the Manufacturing Agreement in January 2005.

Upon his arrival at Tuthill, Goodier became involved in the development of Tuthill's new tank truck blower (the "T850"). Tuthill was developing the T850 to market in competition with Drum's D807 blower as soon as the termination of the Manufacturing Agreement became effective on January 15, 2005. Because the terms of the Manufacturing Agreement prohibited Tuthill from marketing a "Drum" or "Drum-style" blower, Tuthill took certain measures to comply, including having its blower contain no parts that were interchangeable with those in D807. Goodier states that he worked on the development of the T850 with two goals: ensuring

5

that Tuthill met the needs of its customers and ensuring that the T850 was not a "Drum" or "Drum-style" blower. Tuthill began to market its T850 blower to the truck market in January 2005, although it is unclear when the first blowers were available for sale.

Goodier also became involved in the development of a hydraulic cooler, which was a product Tuthill had not previously produced. Goodier's responsibilities included sourcing the components from parts suppliers to be used in the assembly of the hydraulic cooler. Additionally, Goodier began to establish a distribution network for the T850 blower and contacted certain distributors in this regard, including some who had been Drum distributors prior to Gardner Denver's acquisition of Drum.

Gardner Denver initiated arbitration in May 2005 to enforce the non-competition provision of the Manufacturing Agreement against Tuthill. In September 2005, the arbitrator determined that the T850 was not a "Drum" or "Drum-style" blower under the terms of the Manufacturing Agreement, and denied Gardner Denver's claim for breach of contract. Gardner Denver discovered the existence of the Covenant in May 2005, near the beginning of the arbitration, when Bierens located a supplemental personnel file for Goodier while searching for information on another employee. Although Gardner Denver had located Goodier's main personnel file at the time of his departure and again thereafter, the tab on the supplemental file was slightly folded down, obscuring Goodier's name. In addition, no individuals with knowledge of the Covenant were employed at Gardner Denver at the time of Goodier's departure, and Goodier did not inform anyone at Gardner Denver or Tuthill of the existence of the Covenant.[4]

---

[4] Goodier has testified that he had no recollection of the Covenant at the time of his departure.

Following the resolution of the arbitration, Gardner Denver filed this suit in late November 2005[5] and moved for a temporary restraining order in January 2006. The Court denied the motion for temporary relief and ordered expedited discovery in order to determine whether a preliminary injunction is warranted. The Court heard oral arguments from the parties on March 13, 2006. Although Gardner Denver has moved for additional discovery following the hearing, the Court sees no need for any such discovery as the request seems calculated to delay the resolution of this issue and unlikely to lead to the discovery of information relevant to the issues at hand.

## II.

In deciding a motion for a preliminary injunction, this Court must consider and balance four factors: (1) likelihood of success on the merits; (2) irreparable harm that could result if the injunction is not issued; (3) the possibility of substantial harm to others as a result of the injunction; and (4) the impact on the public interest. *See Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n.*, 110 F.3d 318, 322 (6th Cir. 1997). These factors are not "rigid and unbending requirements," as there is no "fixed legal standard" in determining whether to issue an injunction. *In re: Eagle-Pitcher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992). The threshold question is whether Gardner Denver is likely succeed on the merits of its claim to enforce the Covenant. The Covenant states that it is governed by Kentucky law.

Our courts have acknowledged that covenants not to compete "play a critical role in business and are favored as long as they are reasonable in geographic scope and duration."

---

[5] Gardner Denver also brings claims against Goodier for breach of the Confidentiality Agreement, breach of fiduciary duty, and violation of the Kentucky Uniform Trade Secrets Act, and against Tuthill for aiding and abetting the breach of fiduciary duty and violation of the Kentucky Uniform Trade Secrets Act. The Court does not address those claims in this opinion.

*Managed Health Care Assocs. v. Kethan*, 209 F.3d 923, 928 (6th Cir. 2000); *see also Central Adjustment Bureau, Inc. v. Ingram Assoc., Inc.*, 622 S.W.2d 681, 685-86 (Ky. Ct. App.1981) (*citing Ceresia v. Mitchell*, 242 S.W.2d 359 (Ky. 1951)). The Kentucky Supreme Court has stated that "[t]he policy of this state is to enforce [covenants not to compete] unless very serious inequities would result." *Lareau v. O'Nan*, 355 S.W.2d 679, 681 (Ky. 1962). A covenant not to compete with a former employer will be enforceable by way of injunction if it is valid and reasonable. *Louisville Cycle & Supply Co. v. Baach*, 535 S.W.2d 230, 232 (Ky. 1976). Thus, reasonableness is the key to interpreting any noncompete agreement under Kentucky law. As the Kentucky Supreme Court stated in *Stiles v. Reda*, 228 S.W.2d 455, 456 (Ky. 1950), "the test of reasonableness is whether the restraint, considering the particular situation and circumstances, is such only as to afford fair protection to the legitimate interests of the [employer] and not so extensive as to interfere with the interests of the public." (quotation and citation omitted).

The Covenant appears to be facially valid and reasonable. Only a strict analysis of the facts and law will yield the final answer. Indeed, Defendants have raised a number of arguments as to why the Covenant is unenforceable. The first set of arguments address its invalidity and the latter ones concern its unreasonableness. The Court has analyzed all of the arguments relevant to the enforceability of the Covenant. The Court's analysis and conclusions contained in Sections III and IV of this Memorandum Opinion demonstrate that this Covenant is valid and enforceable in these circumstances. Therefore, Gardner Denver has more than adequately established a legal basis for the relief requested.

III.

Defendants argue that the Covenant is invalid because (1) it is not assignable from Drum to Gardner Denver, (2) the Confidentiality Agreement supersedes it, (3) it lacks adequate consideration, (4) Goodier was constructively discharged and (5) it is barred by laches. The Court will address each issue in turn.

A.

Defendants have argued that the Covenant is not assignable from Drum to Gardner Denver. This is incorrect. The Sixth Circuit has interpreted Kentucky law as permitting the assignment of exactly this type of agreement, stating "we believe that the Kentucky Supreme Court would conclude that noncompetition clauses are assignable." *Managed Health Care Assocs.*, 209 F.3d at 930. Here, the Covenant has no provision addressing its assignability. Consequently, the Court finds that Gardner Denver may enforce the Covenant. However, the scope of the restrictions in the Covenant would be limited to the business in which Drum was engaged prior to its acquisition by Gardner Denver. As the court in *Managed Health Care Assocs.* stated, "[a]n assignment does not modify the terms of the underlying contract . . . the only thing that changed was the entity now entitled to enforce the terms and conditions that [the employee] had previously agreed to when he entered into his employment agreement." 209 F.3d at 927-28. Similarly, Gardner Denver merely steps into the shoes of Drum and is entitled to enforce the Covenant on terms applicable to Drum prior to the acquisition.

B.

Defendants have also argued that the Confidentiality Agreement supersedes the Covenant, by virtue of an integration clause stating:

9

> This Agreement constitutes the entire agreement of the parties regarding the subject matter and supercedes all previous agreement whether written or oral. It shall not be modified except by a writing signed by the Employee and a duly authorized officer of Drum.

True, an integration clause such as this would preclude other agreements about the subject matter of the contract – confidential information and trade secrets. *See ADR North America LLC v. Agway, Inc.*, 303 F.3d 653, 657 (6th Cir. 2002). However, the Confidentiality Agreement says nothing about whether Goodier may compete with Drum following the termination of his employment, merely that he may not disclose Drum's confidential information to unauthorized third parties, including future employers. Thus, it addresses a related, but distinct matter – the protection of Drum's confidential information and trade secrets. That the Confidentiality Agreement prohibits disclosure of confidential information to third parties, including employers, does not imply that the Confidentiality Agreement supersedes the Covenant. The two documents serve entirely distinct purposes as seen most clearly in the different duration of each. The Confidentiality Agreement exists in perpetuity, for obvious reasons – it is proper for Goodier to have an ongoing obligation to refrain from disclosing Drum's confidential information, regardless of where he is employed. The Covenant serves a different purpose – to prohibit Goodier from leaving Drum and using his skills and knowledge (which would include, but not be limited to confidential information) for the benefit of a competitor for a period of three years. Accordingly, the Court finds that the Confidentiality Agreement did not supersede the Covenant. Therefore, the Court must interpret the Covenant on its merits.

C.

Defendants further argue that the Covenant lacked consideration and is therefore unenforceable. Defendants base this lack of consideration argument on the Killarney Letter,

which refers to Goodier taking the position of Chief Engineer. Certainly, such a covenant must be supported by adequate consideration. *See Crowell v. Woodruff*, 245 S.W.2d 447, 449-50 (Ky. 1951). The Court finds adequate consideration here.

As noted above, Goodier actually became Engineering Manager upon his return to the U.S., and Bob Jacobsen was made Chief Engineer, because the position of Chief Engineer was required to be held by a licensed engineer. However, the Court finds that the term "Chief Engineer" is merely the British phrase for "Engineering Manager." Indeed, Goodier has not argued that he failed to receive the position he expected. In fact, Goodier received a substantial salary raise and increase in his job responsibilities over his prior position, and Jacobsen, the "Chief Engineer," apparently reported to Goodier. There is no evidence that Goodier ever objected to his employment arrangement upon his return or that he was in any way deceived or coerced into signing the Covenant. In addition, Drum has argued that the Covenant was also necessary because of Goodier's rapid transfer to England and back to the U.S., and that permitting Goodier's return to Drum's U.S. division was independent consideration. The Killarney Letter certainly supports such an interpretation. Killarney expressed serious concern about Goodier's "long term commitment" to the Drum. The Covenant was a valid tool for Drum to use to help ensure that commitment.

The threshold for adequate consideration in Kentucky is relatively low. In *Central Adjustment Bureau*, the court assumed that employees signed covenants not to compete under duress. *Central Adjustment Bureau*, 622 S.W.2d at 686. However, the court then noted that the employees were given raises and promotions by the employer in subsequent years, acquiring "specialized knowledge, training, and expertise . . . which they might not have otherwise

11

acquired." *Id.* The court held that "any lack of mutuality of assent which may have existed on the date the covenants were signed was clearly not lacking on the date [the employees] voluntarily resigned their employment and began competing with [the employer]." *Id.*

Here, the case for adequate consideration is even stronger, because no evidence suggests that Goodier received a different position than the one he expected. The Kentucky Supreme Court held in *Higdon Food Serv., Inc. v. Walker*, 641 S.W.2d 750 (Ky. 1982) that even continued at-will employment is sufficient consideration for a covenant not to compete. There, the court stated "[t]he hiring itself (or rehiring, if one prefers that word) was sufficient consideration for the conditions agreed to by Walker. It makes no difference that Higdon could have discharged him the next day. The point is that it did not have to hire him – or keep him on – at all." *Id.* at 751. Such is the case here. Drum had no obligation to permit Goodier to return to its U.S. offices at all. As the Killarney Letter indicates, Drum had already made a formal offer to another individual for the position of Chief Engineer. Thus, on several grounds, evidence of adequate consideration supports the Covenant.

D.

Defendants argue that the Covenant is invalid because Goodier was constructively discharged. The Covenant prohibits Goodier from competing with Drum for three years following his termination "for whatever reason." This provision is arguably overbroad, because the policy reasons for enforcing covenants not to compete are not as strong where an employer terminates an employee. However, the Court need not reach that question here, because it is clear that Goodier voluntarily resigned.

The situation is analogous to that in *Central Adjustment Bureau,* where the court

enforced a covenant not to compete where an employee voluntarily resigned but left open the question of enforceability where an employer "unilaterally and involuntarily" ends the employment. 622 S.W.2d at 685. Although Goodier was subject to less favorable working conditions at Gardner Denver than he had enjoyed at Drum, he has presented no evidence that he was asked to resign or that his termination was imminent. In fact, Goodier has testified multiple times that he voluntarily resigned. As such, the Covenant is not voided on grounds of constructive discharge.

E.

Finally, Defendants raise a laches defense on the grounds that Gardner Denver allowed fifteen months to elapse between Goodier's resignation and the filing of this action. Laches is an equitable defense which "serves to bar claims in circumstances where a party engages in unreasonable delay to the prejudice of others rendering it inequitable to allow that party to reverse a previous course of action." *Plaza Condo Ass'n v. Wellington Corp.*, 920 S.W.2d 51, 54 (Ky. 1996). However, the doctrine focuses on the unreasonableness of the delay after the plaintiff has knowledge of facts giving rise to the claim. *Wells v. U.S. Steel & Carnegie Pension Fund, Inc.*, 950 F.2d 1244, 1250 (6th Cir. 1991). Laches thus requires that an unreasonable delay by one party prejudiced the other party. *Id.*

Here, the Court finds as a matter of law that the delay was reasonable. Gardner Denver discovered the existence of the Covenant during discovery for the arbitration proceeding. It elected to delay enforcement until the conclusion of that proceeding, during which period Gardner Denver learned important details about Goodier's employment at Tuthill. Gardner Denver filed suit to enforce the Covenant within two months of the conclusion of the arbitration.

13

Defendants argue that Gardner Denver's motive for enforcing the Covenant is essentially to have a second chance at changing the outcome of the arbitration. Even if Gardner Denver's loss in the arbitration motivates the action here in some way, that does not render the delay unreasonable. Further, Defendants have no shown no prejudice as a result of the delay, and Tuthill has certainly benefitted from Goodier's skills in the period he has been in its employ. Goodier testified he did not remember the Covenant when he left to work for Tuthill, which negates any argument that he detrimentally relied on Gardner Denver's lack of enforcement. In short, laches is inapplicable on these facts.

IV.

The Court must now address the reasonableness of the Covenant. Defendants have attacked all aspects of the Covenant's scope – substantive, geographic, and temporal – as unreasonable. The Court will examine each issue.

A.

As to the duration, review of relevant case law suggests that a three-year limitation can be reasonable. *See, e.g., Hodges v. Todd*, 698 S.W.2d 317 (Ky. Ct. App. 1985) (district court had authority to determine appropriate geographic scope for a five year prohibition on former business owner competing in business of remanufacturing of pickup trucks and trailers); *Central Adjustment Bureau v. Ingram Assocs.*, 622 S.W.2d 681 (Ky. Ct. App. 1981) (two year restriction on former insurance adjusters supported by adequate consideration); *Louisville Cycle & Supply Co., Inc. v. Baach*, 535 S.W.2d 230 (1976) (eighteen month restriction upheld on former employee competing with employer in same territory covered by employee while working for employer) *Lareau v. O'Nan*, 355 S.W.2d 679 (Ky. Ct. App. 1962) (five year restriction on

14

doctor practicing in same county as his former employer was not too inequitable to be enforced); *Ceresia v. Mitchell*, 242 S.W.2d 359 (Ky. 1951) (court reformed noncompete agreement to prevent former business owner from competing against new business owner for a period of ten years in the local area); *Stiles v. Reda*, 228 S.W.2d 455 (Ky. 1950) (two year restriction on watch repairman was reasonably limited in time). Goodier was an important employee; he had important knowledge about Drum. The Court finds that the three year term in the Covenant is reasonably limited in time.

B.

The geographic scope presents a closer question. The Covenant prohibits Goodier from competing against Drum by working "as an employee or otherwise, [for] any business that competes with Drum in any area of the United States in which Drum does business." While this is a broad geographic restriction, its scope does not make it unreasonable *per se*. Rather, it must be assessed in light of the relevant circumstances. Contrary to Defendants' argument, the Covenant does not prohibit Goodier from working anywhere in the United States. Rather, it prohibits him from working for a competitor in any area in the United States in which Drum does business. Though Kentucky case law is limited on this point, it appears to support a restriction of this nature. *See, e.g., Central Adjustment Bureau, Inc. v. Ingram Associates, Inc.*, 622 S.W.2d 681 (Ky. Ct. App. 1981) (prohibition on employee competing with former employer anywhere in the United States was reasonable); *Thomas W. Briggs Co. v. Mason*, 289 S.W. 295, 298 (Ky. 1926) ("[t]he territorial limit is reasonable if it is confined to the territory in which the employer keeps his market or carries on his business."). Drum and Tuthill are engaged in a highly specialized business and compete nationally for a finite amount of business. Accordingly, due to

15

the nationwide character of the business in which Drum and Tuthill engage, the geographic restriction is proper.

C.

The substantive reasonableness of the Covenant is the most problematic issue here. The Covenant prohibits Goodier from working "in any capacity, as an employee or otherwise, [for] any business that competes with Drum . . . ." Defendants argue that such a restriction is overbroad and prohibits Goodier from obtaining a position with a competitor that would not involve actually competing with Drum. The Court is inclined to agree. If, for example, Goodier took a position in Tuthill's mail room and Gardner Denver wished to enforce the Covenant, the Court would be hard pressed to find a legitimate basis for doing so because it would be clear that Goodier was in no way "competing" with Drum. However, such is not the case here. Goodier has taken a management level position with a direct competitor of Drum and is admittedly still engaging in work relating to the transportation industry at least ten percent of the time. This ten percent is certainly "competition" of some sort under any reasonable interpretation of the term.

Defendants correctly note that the Covenant must be reasonable in that it must be "such only as to afford a fair protection to the legitimate interests of the [employer] and not so extensive as to interfere with the interests of the public." *Stiles v. Reda*, 228 S.W.2d 455, 456 (Ky. 1950). However, Defendants go further and argue that Gardner Denver "must prove that enforcement is necessary to protect its trade secret or confidential information . . . If [the trade secrets or confidential information] are not being used or are not at risk, there is no protectible interest." This is not an accurate statement of the law in Kentucky.

It is true that trade secrets and customer goodwill are among the most basic interests

16

traditionally protected by a covenant not to compete. *See Crowell v. Woodruff*, 245 S.W.2d 447, 450 (Ky. 1951) (discussing lack of former employee's access to these in refusing to enforce a covenant not to compete). However, more recent cases have adopted a more expansive view of the interests that an employer may legitimately protect, including its substantial investment in an important employee such as Goodier. For example, in *Borg-Warner Protective Servs. Corp. v. Guardsmark, Inc.*, 946 F. Supp. 495 (E.D. Ky. 1996), the court upheld a one year restriction on employees of a security guard firm working for any business for which they had provided security services in the prior year. Certainly, the employees in *Borg-Warner* did not have access to any significant trade secrets or confidential information of their employer. Nonetheless, the court found that, even though the employees' skills were not unique, the security firm had invested in training its employees and familiarizing them with the culture of the client's firm and the client's security personnel. *Id.* at 502. As the court stated in that case, "the more modern cases, including those in Kentucky, place more emphasis on the employer's investment in the employee and have evolved an approach balancing the importance of that factor against the hardship to the employee and the public interest." *Id.* at 501. Similarly in *Central Adjustment Bureau*, the court upheld a restriction on employees of a collection agency, who services were not unique. 622 S.W.2d 681. In doing so, the court noted that the employer's business was "highly specialized and competitive," that clients were free to change collectors very quickly, and that the covenants not to compete were a reasonable method of protecting the employer from investing in training its employees only to face them "resigning and attempting to pirate away their clients." *Id.* at 685-86.

The circumstances in *Borg-Warner* and *Central Adjustment Bureau* are analogous to

17

those here.  Goodier was involved in numerous aspects of Drum's business.  By his own admission, he was uniquely situated to assist Tuthill in developing its new blower in compliance with the Manufacturing Agreement.  Through his tenure at Drum, Goodier held a number of sensitive positions, including being Vice President of Engineering and later of Operations, and a member of the strategic planning and executive committees.  He had responsibility for engineering, manufacturing, and purchasing, including responsibility for all aspects of production, materials management, shipping, receiving, quality control, research and development, and establishing procedures and work instructions.  Goodier's relationships with Drum's distributors and his knowledge of the industry is highly significant, and obviously valuable to Tuthill, his new employer.  The Covenant seeks to protect Drum's investment in Goodier by preventing him (and Tuthill, by implication) from immediately using the skills he gained from years of employment at Drum for the benefit of Tuthill.  To claim, as Defendants do, that use of his knowledge would not constitute "competition" is simply not credible.

In fact, the evidence is that Goodier's current work has assisted Tuthill in competition with Gardner.  Goodier is Director of Business Development with Tuthill.  His responsibilities include business development and identifying new acquisitions, products, and marketing opportunities.  The Court is not inclined to become a monitor of exactly what percentage of time Goodier spends competing with Drum.  He admittedly spends at least ten percent of his time doing exactly that.  He has assisted Tuthill in developing at least two products that directly compete with Drum products.  Under certain circumstances employment with a competitor might not be legal "competition" protectible by a covenant not to compete.  However, this is not that

situation.[6]  Goodier is precisely the type of employee for whom such agreements were designed. Indeed, the events that occurred after he went to Tuthill are exactly what Drum sought to protect itself against.

V.

Gardner Denver has demonstrated that it will suffer irreparable harm if Goodier is not enjoined.  It has undoubtedly already suffered such harm.  Covenants not to compete are prime examples for appropriate equitable relief.  *See Louisville Cycle & Supply Co., Inc. v. Baach*, 535 S.W.2d 230, 232 (Ky. 1976) ("[I]t is well settled that if an employee's covenant not to engage in competition with his employer or former employer . . . is valid and reasonable, equity will assume jurisdiction to enjoin its breach by the employee." (quotation and citations omitted)). Gardner Denver's continuing damages cannot easily be quantified.  Gardner Denver could suffer a number of different types of harm, including loss of goodwill among customers, use of its trade secrets and confidential information, and loss of customers as a result of products Tuthill is developing or may develop with Goodier's help that will compete with Drum products.

The Court does not discount the harm to Goodier.  Tuthill may be required to fill Goodier's current position with another individual.  The position may not be available after the Covenant expires.  This is a somewhat harsh result.  However, Goodier voluntarily entered into the Covenant and received substantial benefits from his employment at Drum, and he cannot now claim that the harm from enforcing the Covenant he agreed to would be too great a hardship

---

[6] However, an overly broad scope would not automatically render the covenant invalid.  The Court has broad authority to limit covenants not to compete to an appropriate scope.  *See, e.g., Hammons v. Big Sandy Claims Serv., Inc.*, 567 S.W.2d 313, 315 (Ky. Ct. App. 1978) ("Where the covenant as originally drawn has been found too broad, courts have had no difficulty in restricting it to the proper sphere and enforcing it only to that extent.")  To the extent necessary here, the Court so limits the scope of the Covenant to prohibit Goodier from legally "competing" with Drum.

19

on him.

Finally, public policy favors issuance of the injunction. Kentucky courts have stated that, absent "serious inequities," the law of Kentucky favors enforcement of covenants not to compete. As the court stated in *Lareau*, "[i]t must be remembered that [the employee], wholly free of any financial coercion, made a solemn covenant with the [employer]." 355 S.W.2d at 681. Likewise here, Goodier agreed to the Covenant when he wished to return to Drum's offices in Louisville, and to deny Drum enforcement of the Covenant is contrary to public policy.

For all of the reasons stated herein, the Court finds that a preliminary injunction is warranted and it will enter an order consistent with this conclusion.

cc:     Counsel of Record